D.A.B.E., INC., et al., Plaintiffs,

v.

CITY OF TOLEDO, Defendant.

No. 3:03CV7637.

United States District Court,
N.D. Ohio,
Western Division.

Nov. 19, 2003.

Kimberly A. Donovan, Kerger & Kerger, Richard M. Kerger, Kerger & Kerger, Stephen D. Hartman, Kerger & Kerger, Toledo, OH, for Plaintiffs.

Adam W. Loukx, City of Toledo, Department of Law, Keith A. Wilkowski, Vassar, Dills & Dawson, Toledo, OH, for Defendant.

## ORDER

CARR, District Judge.

This case arises from passage by the City Council of Toledo, Ohio, of "The Clean Indoor Air Ordinance of 2003." Plaintiffs, owners of restaurants and bars in Toledo, challenge the legality of the ordinance. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Pending is plaintiffs' motion for a preliminary injunction. For the reasons that follow, the motion will be denied.

Toledo City Council adopted the challenged ordinance on July 8, 2003, and it became effective on August 24, 2003. Ordinance 509–03, codified at Toledo Mun. Code § 1779.01 *et seq.* The ordinance amends an earlier ordinance (Toledo Mun. Code § 1779.01 *et seq.*, enacted 1987). Both enactments deal with smoking in public places.

The challenged ordinance regulates the ability to smoke in enclosed public places. It applies to a broad range of public places, among them retail stores, theaters, courtrooms, libraries, museums, health care facilities, and, most relevant to the instant case, restaurants and bars.

The ordinance provides that in enclosed public places, smoking is generally prohibited, except in a "separate smoking lounge" designated for the exclusive purpose of smoking. No establishment is required to provide such a smoking lounge; and any establishment is free to designate its establishment entirely non-smoking.

If an establishment chooses to provide a separate smoking lounge, such lounge: 1) cannot constitute more than thirty percent of the total square footage of space to which the public is invited; 2) must be completely enclosed on all sides by floor-to-ceiling walls; 3) must have a separate ventilation system not used by the non-smoking portion of the establishment; 4) must not incorporate the sole path to or from the restrooms, to or from the non-smoking portion of the establishment, or into or out of the building or waiting areas; and 5) cannot be an area where employees are required to work. The ordinance includes a provision whereby an establishment can receive a 120–day exemption to construct a smoking lounge meeting these requirements.

In the Toledo area, only the City of Toledo has adopted an ordinance banning smoking in bars and restaurants, or restricting it to enclosed, separately ventilated areas. None of the communities surrounding Toledo have adopted similar provisions.

On October 31, 2003, plaintiffs filed their complaint, in which they contend that the ordinance violates the Takings Clause of the Fifth Amendment to the federal Constitution and contravenes the Ohio Revised Code. Plaintiffs' motion for a temporary restraining order was denied.

Affidavits by the plaintiffs assert that their bars and restaurants have seen a marked decrease in business since adoption of the ordinance. Some plaintiffs state that they have been, or will be required to close or move their businesses. Other plaintiffs allege that their revenues have been reduced significantly, and that their livelihoods are thereby threatened. The affiants allege that historically a large percentage of their patrons have been smokers, and that many of their customers appear to be going outside the city to establishments where they can smoke.

Some plaintiffs have been able to obtain the 120–day exemption; others have not made such a request, because they either are financially unable to construct a smoking lounge, or rent the building in which their businesses are located, and cannot or do not desire to make improvements to their landlord's property.

This court held a hearing on plaintiffs' motion for preliminary injunction on November 14, 2003. The sole witness, Dr. David Price, a Professor of Public Health at the University of Toledo, was called by the City. He testified extensively about the harmful effects of environmental tobacco smoke ("ETS"), commonly referred to as second-hand smoke. Dr. Price's testimony, uncontradicted by plaintiffs, established that, based on conservative estimates, one non-smoking Toledoan dies each week, on average, from heart disease or lung cancer directly related to the effects of exposure to ETS.

The purpose of a preliminary injunction is to determine whether sufficient evidence supports preliminary equitable relief. *See Adams v. Federal Express Corp.*, 547 F.2d 319 (6th Cir.1976). In deciding whether to issue a preliminary injunction, a district court must consider:

> (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir.2003) (citing *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888

(6th Cir.2000)). These four considerations are factors to be balanced, not prerequisites that must be met. *Id.* (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985)). A district court is not required to make specific findings concerning each of the four factors if fewer factors are determinative of the issue. *Id.*

## DISCUSSION

### A. Likelihood of Success on the Merits

Plaintiffs' challenge the Clean Indoor Air Act on two grounds, namely, that the ordinance: 1) constitutes a facially invalid regulatory taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution; and 2) conflicts with a general law (O.R.C. § 3791.031), in violation of the provision in the Ohio Constitution that provides for "home rule" for municipalities so long as their ordinances do not conflict with "general laws."

#### 1. Takings Claim

■ The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. AMEND. V. "The Supreme Court has recognized two categories of takings: physical takings and regulatory takings." *Waste Mgmt., Inc. v. Metropolitan Gov't of Nashville*, 130 F.3d 731, 737 (6th Cir.1997) (citations omitted). A physical taking occurs where the government physically intrudes on a plaintiff's property, or allows others to do so. *See id.; see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

■ The plaintiffs in this case are not alleging a physical taking. They allege, rather, a regulatory taking.[1] A regulatory

---

1. Plaintiffs couch their claim as a "facial" takings challenge to the ordinance, rather than an "as applied" challenge. There is a ripeness requirement prior to bringing an "as

scheme effects a "taking" if the regulations do not substantially advance legitimate state interests or deny an owner economically viable use of his land. *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *see also Keystone Bituminous Coal Ass'n v. De Benedictis,* 480 U.S. 470, 484, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Here, plaintiffs are not alleging that the ordinance at issue does not substantially advance a legitimate state interest; plaintiffs contend, rather, that the ordinance denies the plaintiff owner economically viable use of their land.

As such, a regulatory takings claim has two components. First, the plaintiffs must establish "that the regulation has in substance 'taken' [their] property—that is, the regulation 'goes too far.'" *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) (citing *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) and *Kaiser Aetna v. United States,* 444 U.S. 164, 178, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). Second, the plaintiffs must "demonstrate that any proffered compensation is not 'just.'" *Id.*

There are two levels of regulatory takings. First, a regulation that allows the property owner "*no* productive or economically beneficial use of land" (sometimes called a categorical, or complete taking) entitles the property owner to just compensation under the Fifth Amendment. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Second, a less intrusive regulation which simply prevents the property owner from some but not all economic use of his land (sometimes called a partial, or non-categorical taking) may still entitle the property owner to just compensation, depending on the level of intrusion and the governmental interest at stake. *See Anderson v. Charter Tp. of Ypsilanti,* 266 F.3d 487, 493 (6th Cir.2001).

The plaintiffs in this case are alleging a non-categorical, partial taking. As the Sixth Circuit explained in *Waste Management, supra:*

> The Supreme Court has declined to lay out a set formula for determining whether a regulatory taking has occurred, preferring instead to engage in essentially ad hoc, factual inquiries. The Court has, however, identified several factors which have particular significance in determining whether there has been a taking, namely 1) the character

---

applied" constitutional takings claim in federal court, requiring a plaintiff to exhaust his available state court remedies. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Arnett v. Myers,* 281 F.3d 552, 562 (6th Cir.2002). Had plaintiffs not disavowed an "as applied" takings challenge, this Court would have had to dismiss the takings claim without prejudice, as the Sixth Circuit has held that the state of Ohio has provided an adequate procedure for seeking just compensation for a regulatory taking. *See Silver v. Franklin Township, Board of Zoning Appeals,* 966 F.2d 1031, 1035 (6th Cir. 1992) (holding that through the writ of mandamus, "Ohio law provides a procedure for obtaining just compensation for a governmental taking."); *see also Tri–Corp. Mgmt. Co. v.*

*Praznik,* 33 Fed.Appx. 742, 749–50, 2002 WL 486241 (6th Cir.2002) (explaining that *Silver* applies to regulatory takings claims; dismissing the regulatory takings claim on ripeness grounds, as plaintiff failed to allege it sought and was denied just compensation through Ohio's writ of mandamus state court remedy).

However, the Supreme Court has noted that facial takings claims are generally ripe the moment the challenged ordinance is passed. *See Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). Therefore, the analysis that follows applies to the merits of the facial takings claim. Nothing in this opinion prevents plaintiffs from seeking compensation through the Ohio state system in an "as applied" challenge.

of the governmental action; 2) the economic impact of the regulation on the claimant; and 3) the extent to which the regulation has interfered with the claimant's distinct investment-backed expectations.

130 F.3d at 737 (internal quotations and citations omitted); *see also Anderson*, 266 F.3d at 493.

First, with regard to the "character" of the governmental action: the regulation indisputably regulates behavior which creates a significant risk to the health of non-smokers. This is not, like nearly all takings cases,[2] a land-use regulation: it is, rather, a response to a serious public health problem.

The extent of that problem is not, moreover, limited solely to the impact of ETS on the health non-smokers. That direct consequence has an indirect, but substantial public impact in the form of increased health care and related costs that must be borne by society as a whole.

In addition, according to Dr. Price's testimony, other measures, including the designation of unenclosed smoking and non-smoking areas, do not significantly reduce the dangers from exposure to even diluted amounts of ETS. The ordinance simply seeks to eliminate employees' and non-smoking patrons' exposure to ETS in those public places in which there is likely to be a heightened risk of such exposure.

The ordinance unquestionably has an adverse economic impact on plaintiffs' businesses, two of which have closed their doors (though one of those may be moving to an adjacent suburb), and the others of which have experienced losses of revenue and decreased profits. This fact is the most compelling aspect of plaintiffs' takings claim.

But it is not enough, standing alone, to give rise to a substantial likelihood of success as to this claim. This is particularly true when the final factor—interference with investment-backed expectations—is taken into consideration.

For nearly five decades, smoking has been the subject of public and governmental concern. For twenty-five and fifteen years, respectively, the State of Ohio and City of Toledo have had in place enactments restricting smoking in public places, including bars and restaurants. The trend of regulation elsewhere in the country has been to lessen the opportunities for exposure to ETS. That trend reflects growing concerns on the part of scientists and public health experts and officials about the risks, not just to smokers themselves from smoking, but also to non-smokers exposed to second-hand smoke.

Businesses dependent in whole or part on patronage by smokers, and those who invest in such businesses and seek to make their livelihoods from them, have thus long been on notice that the value of their investments, and implicitly, the ability to profit from such businesses, may be affected adversely by continuing governmental efforts to reduce exposure to second-hand smoke. *See, e.g., In re Blue Diamond Coal Co.*, 79 F.3d 516, 525–26 (6th Cir. 1996) (expectation of non-regulation unreasonable in heavily-regulated industries; also, unreasonable to expect not to be held accountable for health of its coal-mining employees, whom company subjected to health risks). "Those who do business in [a] regulated field cannot object if the leg-

---

**2.** A survey of takings law reveals that nearly every takings case deals with a land-use regulation. I will assume without deciding that the ordinance at issue here, while not technically a land-use regulation, is sufficiently analogous to such regulations that the same legal principles apply. No case upholding a facial challenge to a smoking regulation on the basis of the Takings Clause has been cited by the plaintiffs or uncovered through independent research.

islative scheme is buttressed by subsequent amendments to achieve the legislative end." *FHA v. Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958). "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005–06, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)).

Plaintiffs claim that, in view of the accessibility of smoker-friendly bars and restaurants in adjacent communities, a statewide regulation would be less harmful to their businesses than Toledo's ordinance. The fact that the State of Ohio could enact a statute with state-wide reach does not bear on the issue of whether the City of Toledo's ordinance constitutes a taking. The desirability of one alternative does not establish the unconstitutionality of the other.

■ Based on an analysis of these legal principles, I find that plaintiffs have failed to establish a strong likelihood of success on the merits of their facial regulatory takings challenge. While the challenged ordinance will certainly have a negative effect on the plaintiffs' revenue and profits, the character of the regulation and the lack of investment-based expectations in non-regulation compel a finding that it is highly unlikely that the plaintiffs could prevail on their claim that the ordinance goes too far as a matter of law.

## 2. State Law Conflict Claim

Plaintiffs claim that Toledo's ordinance is invalid because it operates in an area that has been preempted by a statute adopted by Ohio's General Assembly.

Ohio's constitutional "home rule" provision provides:

Municipalities shall have authority to exercise all powers of local self-govern-

ment and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.

Ohio Const. § 18.03.

■ An ordinance is "in conflict" with a general law if "the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Middleburg Heights v. Ohio Bd. of Bldg. Stnds.,* 65 Ohio St.3d 510, 512, 605 N.E.2d 66 (1992) (citations omitted). To the extent that the state statute does not address or apply to an item or issue, however, an ordinance regulating the excluded item or issue is not "in conflict" with the state statute. *See Mr. Fireworks, Inc. v. City of Dayton,* 48 Ohio App.3d 161, 163–64, 548 N.E.2d 984 (1988).

In 1976, the General Assembly passed a general law regulating smoking in defined "places of public assembly." O.R.C. § 3791.031. Specifically excluded from the definition of "places of public assembly," and therefore not addressed in the law, were "[r]estaurants, food service establishments, dining rooms, cafes, cafeterias, or other rooms used primarily for the service of food, as well as bowling alleys and places licensed by the division of liquor control to sell intoxicating beverages for consumption on the premises." *Id.* § 3791.031(A)(3).

Plaintiffs argue that this Court should interpret this exclusion as a clear indication that the legislature intended to bar regulation of smoking in the public places excluded from the reach of O.R.C. § 3791.031. Specifically, plaintiffs argue that any "home rule" regulation by an Ohio municipality (including the challenged ordinance in this case) of smoking in public places conflicts with the general law and is invalid under § 3791.031.

■ I find that plaintiffs have failed to establish a likelihood of success on the

merits of this claim. First, plaintiffs argument that any authority to regulate that was not explicitly granted by O.R.C. § 3791.031 must necessarily have been excluded is erroneous. Plaintiffs, in essence, wish to rewrite O.R.C. § 3791.031 to include a specific prohibition against a home rule municipality legislating as to smoking in bars and restaurants.[3] There is no such prohibition in the statute, and I will not read one into it.[4]

In a case substantially analogous to the instant case, the Ohio Court of Appeals held that the legislature's specific exclusion of items from regulation did not mean that the municipality was prevented from exercising its home rule authority to regulate with regard to those excluded items.

*Mr. Fireworks, supra,* 48 Ohio App.3d at 163–64, 548 N.E.2d 984. The court specifically found that the legislature's "hands-off approach to sparklers and novelty makers" did not mean that those items were "permit[ted]" by the statute. Rather, the statute simply did not address such items.

In this case, the General Assembly's exclusion of bars and restaurants from the reach of § 3791.031 does not mean that smoking in bars and restaurants is absolutely permitted, and that any home rule regulation of such behavior is barred. The statute simply did not cover smoking in bars and restaurants. Like the court in *Mr. Fireworks,* I conclude that a home rule municipality can, without violating Article XVIII, § 3,[5] act where the legislature

---

**3.** Such specific prohibition would, as defendant points out, render the law not a "general law." *City of Canton v. Ohio,* 95 Ohio St.3d 149, 766 N.E.2d 963 (2002).

**4.** The fact that the legislature failed to legislate as to smoking in bars and restaurants convinces me that § 3791.031 is not a "comprehensive statutory scheme." Had the legislature wished (as plaintiffs suggest) to relieve bars and restaurants from any regulation as to smoking, rather than exclude them by definition from the statute, it could have clearly indicated an intent, through the statute itself, not to allow regulation of smoking in bars and restaurants.

Inclusion of a direction that municipal governments should apply the dictates of § 3791.031 to government buildings does nothing to further plaintiffs' arguments; it merely clarifies the intent that government buildings were included in the regulated places, and how the regulation was to be applied to those buildings. It does not, as plaintiffs suggest, evidence an intent to disallow municipal governments' home rule authority over everything else related to smoking in public places. That is not what § 3791.031 does, and I will not presume such an intent without a clear indication in the statute that that is what the legislature meant to do.

**5.** I note in passing that this case, while factually similar to the previous case before the

Honorable David A. Katz in *D.A.B.E. Inc. v. Toledo–Lucas County Board of Health,* Case No. 3:01 CV7334 (N.D.Ohio, 1991), is not governed by the certified questions presented to the Ohio Supreme Court in that case. In Judge Katz's case, the primary question was whether a county board of health (not a home rule municipality) had authority to enact a smoking ban. That is not the situation presented by this case.

I decline to certify the state law question in this case to the Ohio Supreme Court because any such question would simply ask that Court to apply well-settled legal doctrines regarding home rule powers to the particular facts of this case. The opportunity to certify questions of state law to the Ohio Supreme Court, as provided under Rule XVIII of the Rules of Practice Before the Ohio Supreme Court, is intended to resolve previously unanswered questions of state law, not questions about the application of settled legal doctrines to novel factual circumstances.

In response to Judge Katz's certification order, the Ohio Supreme Court held that a county-wide health agency did not have authority to enact an anti-smoking ban. *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health,* 96 Ohio St.3d 250, 773 N.E.2d 536 (2002). Had that challenge not been successful, all restaurants and bars in Lucas County, Ohio, where Toledo and its adjacent suburbs (except Perrysburg) would be regulated equally.

has declined to do so Despite plaintiffs' arguments to the contrary, plaintiffs have failed to establish a likelihood of success, much less a strong likelihood of success, as to their claim of a conflict between the Toledo's ordinance and O.R.C. § 3791.031.

### B. Irreparable Injury

Given the lack of merit to the legal claims asserted in the complaint, plaintiffs' burden to show irreparable injury is very substantial. *See, e.g., Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 104 (6th Cir.1982) ("[W]here the plaintiff establishes something less than probable success on the merits, need for proof of the threat of irreparable damage is even more pronounced.") (quoting *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1359 (2d Cir. 1976)). While plaintiffs' affidavits show that plaintiffs have incurred and are likely to incur economic losses as a result of the ordinance's enactment, that impact, when balanced against the unlikelihood of success on their claims for relief, does not entitle plaintiffs to an injunction staying enforcement of the ordinance. Harm, even significant harm, should not freeze enforcement of what appears to be an otherwise legally valid ordinance.

### C. Balance of Harm to Others

Based upon the record, injunctive relief has the possibility of harming others in two distinct ways: 1) harm to the non-smoking population of Toledo, which would continue to be subject to the harmful effects of ETS in plaintiffs' bars and restaurants; and 2) harm to the enforcement mechanism set in place by the ordinance. The second of these is of lesser significance, and standing alone would be immaterial.

Dr. Price's uncontradicted testimony as to the harmful effects of ETS on employees and non-smokers was, however, quite compelling. That testimony established the biological effects of ETS that appear within as little as thirty minutes of exposure to ETS. It also established the uniquely deleterious mixture of chemicals and carcinogens in second-hand smoke. Enjoining an otherwise legally valid ordinance would, on balance, present an unacceptable risk of harm to the non-smoking patrons and employees of plaintiffs' establishments. This factor weighs against the granting of injunctive relief as well.

### D. Public Interest

The public certainly has a substantial interest in the enforcement of legally valid ordinances that protect public health. This factor weighs against granting injunctive relief.

### CONCLUSION

In summary, I find, on balance, that consideration of the pertinent factors weighs against injunctive relief enjoining enforcement of the City of Toledo's Clean Indoor Air Ordinance of 2003.

It is therefore

ORDERED THAT plaintiffs' motion for a preliminary injunction be, and hereby is denied.

So ordered.